Paul, on behalf of the Appalachians and Christopher P. Banasac, on behalf of the FAA, this is Tom T. Gregory. Thank you. Mr. Banasac? Good afternoon. May it please the Court? Instead of a tale of two cities, this case involves a tale of two trials. And just to give you a very brief bit of background, I think, will help frame the issues. Reliable Fire is a company that sells fire alarm and suppression systems and related equipment and services. Mr. Arrendondo and Garcia were employed by Reliable as salespeople for a number of years and signed non-competition agreements with Reliable. Counsel, if I could, if it's all right with you, step with regard to the facts. I think we've all read the briefs and so are familiar with them. And I think probably there are going to be a number of questions and issues that we need to address. So I would ask you, and I appreciate the courtesy, but ask you to maybe skip over that. And I have a question, I guess, right off the bat, and that has to do with the supplemental briefing we asked you to do. Would you speak to us about why, in your view, the Fourth District was correct in rejecting the longstanding legitimate business interest test? Sure. If you look at the Sunbelt case, the court in that case went through an analysis going back to the late 1800s, I believe, of Illinois Supreme Court precedent on what is the appropriate standard to evaluate the enforceability of restrictive covenants. And in that case, Sunbelt looked at, through the years, what tests has the Illinois Supreme Court applied in evaluating the reasonableness of restrictive covenants. And the conclusion was that the Illinois Supreme Court consistently, throughout the years, in all of the cases where it has examined the enforceability of restrictive covenants, has applied a test where they've looked at whether the time and territory restrictions are reasonable. The Sunbelt case said that there was not a single Illinois Supreme Court case which had ever adopted or approved of this legitimate business interest test. And it went back to determine what the roots of that were in the appellate courts. As part of that, it looked at the Kohler case, which I think was the case that originated that standard. And in Sunbelt, the court said, if you look at the Kohler case, it cites Cockrell and Canfield as the basis for the origin of this test. But then if you, in turn, look at Cockrell and Canfield, they don't actually have that test as part of the analysis. It still goes back to the analysis of whether the time and the territory in the restrictive covenant are reasonable. Well, even though the Supreme Court may not have used the exact words legitimate business interest test, isn't it correct that in all of these early cases, and even up through Mohanty, what the Supreme Court did is really balance the restraint on trade with the legitimate interest of the primacy? Isn't that correct? Yes, I think it is correct that there is an analysis there that you have to apply in order to determine whether the restraints are reasonable. But if you look at what that analysis is, in the Supreme Court cases, it does not involve this legitimate business interest test with the seven factors and the other variety of things. In fact, if you look at the Mohanty case, and this is a quote from it, it says, in determining whether a restraint is reasonable, it is necessary to consider whether enforcement will be injurious to the public or cause undue hardship to the promisor, and whether the restraint imposed is greater than is necessary to protect the promisee. So there's nothing in any of those cases that delineates what has really become a second test. What the appellate courts have said is you need to first satisfy this legitimate business interest test, and then you look at these other factors to determine whether it's reasonable. But there's not an Illinois Supreme Court case that I'm aware of, and this is what the Sunbelt case says, I believe, that has ever adopted that test. Well, Mohanty also says, the court there, thus we find, and this is the Supreme Court, that the restraint on the practice of medicine here was not greater than necessary to protect defendant's interest. Correct. Okay. And that's the, I'm not saying, and I don't think the Sunbelt court is saying that it's just a free-for-all and there's no standard to be judged. I think what they're saying is that's not the right test. The test that the Supreme Court has identified involves this assessment of whether the restraint is greater than necessary to protect the promisee and the hardship to both the employee and the public. It does not involve determinations of permanency or the permanency of customer relationships and all of the other factors that are part of the legitimate business interest test. Now, with that balance, balancing test, doesn't that get us to Dam, Snell, and Tavern, that case, then, where our appellate court here, the second district, did use the language, use the same principles, and talk about a legitimate business interest test? I think you certainly can apply a test. The question that the Sunbelt case raises, I think, is whether that test is inconsistent with what the Supreme Court has said is the proper standard for judging. And you're saying it is inconsistent. It is inconsistent. So what then are you suggesting is the test? Is this the time and territory analysis that comes forth in Sunbelt? It's the time and territory analysis. And as part of that analysis, the court does need to look at, you know, is this a greater protection than is necessary for the protection of the employer? Is it an undue hardship on the employee? Is it an undue hardship on the public? But part of what it boils down to is an assessment that, given this business, is it inappropriate to restrict the employee from whatever it is. So are you saying specifically that the time and territory analysis encompasses the issue of the legitimate interest? How do you reconcile the two? Yes. I think that the analysis that the Supreme Court has set out, as described in Sunbelt, where you look at the time and territory and evaluate these factors, is it injurious to the public or the employee, does encompass an evaluation of that standard. The problem is the Illinois Appellate Court decisions that have come out since, again, have created a whole new test that they have said you need to satisfy. So I do think it's inconsistent with the pronouncements from the Illinois Supreme Court of the proper test. Well, are you saying then that the time and territory test specifically addresses the legitimate interest of the promising? Yes, it does. It does. So you're saying they're not inconsistent? Well, I'm saying that the standards that have been set out as part of this legitimate business interest test are inconsistent because it encompasses things that are not included in the test that the Illinois Supreme Court has set forth. Well, why then would you not file decisions of the Illinois Supreme Court? I think you do. I think that's the point of the Sunbelt case is that we have to go back to what the Illinois Supreme Court has said, look at the test and the standard that they've set out, and follow the standard that they've set out in those cases rather than the Appellate Court cases which have diverted from that over the years. Okay. Maybe we can move on to another point if you wish. And if you look at the agreements that are in place in this case, if you apply that test, the test that was set forth in the Sunbelt case and has set forth in the Illinois Supreme Court cases, the restricted covenants that are involved here are reasonable, they're enforceable. There's no argument by Mr. Arredondo or Mr. Garcia that there's any injury to the public from enforcing these agreements. They claim in some form that there's some undue hardship to them, but there's not. The agreements are limited in duration to a period of a year, which courts have repeatedly found to be reasonable, and it's also limited in scope. It doesn't say you can't work in this industry. It just says within a defined territory, you can't work for a business that's selling products competitive with the ones that Reliable is selling to customers that Reliable did business with in the year prior to their termination. Let me stop you and ask you a question on that. Is there any evidence in the record anywhere that the plaintiff's customers were ever solicited by Mr. Arredondo or Mr. Garcia? Any competent evidence in the record there? Yes, I think there are a number of – there was testimony regarding how they obtained this business. There were quotes that the defendants submitted to these customers. There also were telephone records showing contact with some of these customers. Did any of the plaintiff's customers ever testify directly they were solicited by Arredondo and Garcia that you can point us to in the record? I can't say that there's a testimony directly from a customer who talked about solicitation. Now, you said the geographic – you're arguing restrictions in this case, the covenants were reasonable. Didn't it bar Arredondo and Garcia from working in three entire states? No. It did not? That is not correct. I think that's the gloss that the defendants would like to put on it, but if you look at the language of the provision that they're referencing, it does not prohibit them from working in three states. What it says is you can't work in those three states for a business that is pursuing competitive business with reliable customers, which is a defined term, and it's limited to customers that they've done business with in the year before they left. I think you're sort of exalting, in all due respect, form over substance. Well, no, I don't agree with that, Your Honor, because, just to give an example, if they chose to open up High Rise, a competing fire equipment business, they would have been free to open up that business across the street from Reliable and engage in competitive activity. As long as they were not pursuing that competitive activity with the small group of customers that Reliable did business with out of the total pool, they were free to do it. So it didn't prohibit them from working anywhere they wanted as long as they were not pursuing business with this defined group of customers. Why did the trial judge find the agreement to restrictive covenant to be unenforceable? She was looking at the legitimate business interest test, and her determination, which I think is wrong for a couple of reasons. First of all, she said that under the standard that other Illinois appellate courts have applied, you can have a non-competition provision of restrictive covenant if you have confidential information to protect or if you've met this test regarding the nature of the business. With respect to the information, her finding was that you need to have a trade secret in order to have a protectable interest, which, first of all, is not the right standard. And I flawed the entire analysis on that point because she found that this information that was involved that the defendants were using was not the trade secret, but that's not the standard. The standard is that you have to have some kind of confidential information. And again, this is applied under the test that the Sunbelt Court has rejected. But she also found that the nature of the business was such that the customer relationships were not deserving of protection. And again, I think that's a flawed analysis because if you apply even under this seven-factor test and the nature of the business test, it's not reliable to satisfy the requirements. There was evidence that, for example, it takes many, many years to develop these relationships in order to obtain this business from customers. Defendants themselves testified to that fact. Every employee had access to this customer list, right? While there were restrictions on how it could be used, the information itself was designated as confidential. And there was certain information that was restricted to certain employees at the company. Now, these customers were electrical contractors, right? They were electrical contractors and also building owners. And they could be found in directories? No question. Okay. I'll show you right now. There's no dispute about that. They could easily find the names of the customers. But that's not what reliable is trying to protect. You certainly could go to a phone directory and look up electrical contractors. The things that are worthy of protection are when you submit a quote for a project, the information that goes into that is confidential. Your competitor doesn't know what your markup is. It doesn't know what your cost into that project is. It doesn't know the labor costs associated with it. All the things that go into making up that quote and what your profit margin are are not things that are available to the public. So that's the confidential information that is protectable here. And with respect to the nature of the business, again, it's not the names of the customers. It's the relationships that are built up with the customers over a number of years so that when they have a project, they call you. And they say, we'd like a quote for this project. And with respect to Mr. Arredondo and Garcia, they were the ones that were reliable, who were responsible for developing those relationships. There was testimony in the record that Reliable has worked with many of the same customers for 35 years and retained approximately 80 to 95 percent of its customer base from your year. So these are people that they work with over and over and over again. Counsel, I think I'm going to stop you here. You will have some additional time. I just want to clarify and answer some of your questions about the non-competitive agreement that prohibited them. You said they could open a business right across the street. Correct. And they could solicit all the electrical contractors they want as long as they didn't solicit electrical contractors or building owners that were already customers of your client. Correct. And only those customers who were customers of my client in the year before Mr. Arredondo and Mr. Garcia. Correct. And therefore, it wouldn't matter whether they solicited those. They couldn't do business with an existing customer of Reliable whether they had solicited the business or whether the customer had solicited them. That's correct. Okay. And they also, they were not limited though to being restricted to dealing with customers of the day these two gentlemen, Arredondo and Garcia, had personally dealt with. It ran to all customers of Reliable. That is correct, based on the language. And then when you say that Reliable builds up its relationship with customers over the years so that they might even get a call, hey, we'd like you to bid this for us, it's still a bidding process. There's a record show that in most of these situations, or maybe all the situations, even if it's an existing customer of Reliable, that customer gets bids from other competitors of Reliable. That is correct. There are bids submitted by others for that same work. Right. But if you look at the history of it, Reliable consistently gets that work. But the 85 percent carryover year to year, they get it. Now, as to the confidentiality of this information as to what the costs are, if a competitor knows the costs, it can commit an underbid. So how confidential is this? I guess I don't mean how confidential is it. How don't people just know this is a product that everybody can buy? I mean, by everybody, Reliable, this new company that they started and all the other competitors, they're all buying the same product, they're selling it, and they're installing it. And how complicated is this as a cost? Well, keep in mind it's not just a product. What they sell are systems. It's a system that goes into a 40-story building, and part of it is the product, the actual physical thing. It's sort of like building a house. When you go to someone who is a builder and they design your house, they provide the materials and they build it. That's what Reliable does with respect to these firearm systems. They provide the product, but they also do the design work, they do the service work, they do the installation. And so all of that is part of what the customer is buying. And that's why it's not as easy to go and say, well, I can buy this off the shelf for X dollars. There's a lot more involved in it and a lot more variation in how you go about coming up with what you need to charge the customer for that project. And your position is that they have access to the methodology and the profit margins, et cetera, that Reliable uses so they can closely underpin it? Yeah, and if you look at an example, there's the Millard case that deals with janitorial services. It's sort of the same situation here. In that case, the court found that the person who was doing the bidding for the janitorial services had access to all that type of information. That provided a basis for a protectable interest. And, in fact, if you look at this case, what Mr. Arredondo and Mr. Garcia did in many cases was submitted quotes for the very same projects they quoted for Reliable. In some instances, they left Reliable's name on the bottom of the quotation. So that's the thing that's harmful is that they're able to quickly and easily use that for many cases. Excuse my interruption again, but take that that you just said and put that into your damages case now. You've got evidence to say that they actually submitted bids for, I'm sorry, what's the name of the new company? High Rise. High Rise. They submitted bids to High Rise and they had already bid that same project for Reliable. And did you put into your damages case that, in fact, High Rise got it instead of Reliable? Yes. In fact, there's a, if you look at one of the exhibits, there's a chart that shows a number of jobs that High Rise got that were the jobs at issue. That included the jobs that I'm mentioning where there were quotes submitted for the same project that were originally quoted for Reliable. But didn't the evidence, as I understand it, consist mainly in terms of damages that Justice O'Malley asked about? Lost quotes versus any evidence regarding lost profits? No. You're saying there was evidence of lost profits in the record? Yes. For the time period that is relevant? Yes. Yeah. In fact, if you look at it, the chart, and this is a chart defendants prepared, which shows year to date, and this is 9-22-04 jobs booked. A job booked means a job you got, that you did. Jobs, there's a separate chart that shows jobs quoted. That's different. Those are ones that are quoted. You may get it, you may not. But the jobs booked are the ones that you got, and there was testimony by the defendants that they did these jobs. Counsel, just a quick question to follow up on Justice O'Malley's point. The agreement in this case prohibited Mr. Dondo and Garcia from doing business with all of your clients' customers, not just those that they had contact with, correct? If you look at the provisions in Section 5.2, it does apply to all of the customers. So in terms of the concern about using this methodology, using these trade secrets, and dealing with them, how does that come into play? Because they're prohibited not only from doing business with the current customers, or with the ones that they work with, but with any of the customers from your company. So this is more like a covenant not to solicit as opposed simply to compete. They can't have any contact with any of the customers, whether they've dealt with them in the past or not, correct? Well, it's limited again to a defined group of customers, which is the ones that Reliable has done business with in the year preceding their departure. But in response to your question about how can they use that, it doesn't matter whether they're applying that on a particular job that they've done. If they know what the internal costs are at Reliable that go into making up a quote, they can apply that to other jobs and other projects as well. So it's not just limited to the specific ones that they did. They know the methodology. They know what the costs are at Reliable to do these things. So they can apply that to a different quote for a different job for a different customer of Reliable. You'll get another opportunity. Thank you. Mr. Gregory. Thank you. Good afternoon, Your Honors. My name is Tom Gregory on behalf of the defendants, Arnold Arredondo, Renee Garcia, and High Rise Security Systems. We are asking this Honorable Court to affirm the decisions of the trial court led by the Honorable Judge Bonnie Wheaton. Your Honors, I would like to focus your attention on the real reasons why we are here today. The real reasons why we are here today have to do with the failures made by the plaintiff before the trial court. And I can summarize those failures here at the outset in three points. First, there was no evidence to support plaintiff's claims. Second, there was no evidence to support the alleged damages. Third, there were arguments not made before the trial court that have been waived on appeal. Those are the real reasons why we are here, Your Honors. Now, directing Your Honor's attention to my first point. The plaintiff produced no evidence of solicitation, no evidence of competition. The plaintiff called no customer to the witness stand to testify that Mr. Arredondo or Mr. Garcia solicited them to do business. I'm going to get back to the point I tried to clarify before. The contract doesn't just bar solicitation. It bars doing business irrespective of whether the customer solicits High Rise or High Rise solicits them, right? Yeah. So the fact that they didn't solicit anybody wouldn't mean they didn't violate the contract, if the contract's enforceable, if they did business with a customer of reliable who, by customer, has defined having done business in the preceding year. It wouldn't matter who did the solicitation at that point. There was a very narrow time period at issue that the trial court pointed out. It was the three-week period up through October 1st. Sorry, you've lost me on that three-week thing. Let me focus. You're emphasizing there's no evidence that these general group clients solicited. And I'm saying even if they didn't solicit, they could still violate the contract because the contract didn't just bar them from soliciting reliable customers. It barred them from doing business with reliable customers, whether they solicited the other customers or not. Am I correct? That would have been according to the non-competition provision. Right. But… That's under the contract, yes. That's all I'm asking. But there would have to have been a competitive bid also put in by Reliable Fire. And there are replete examples in the record where Reliable Fire didn't bid, and so actually there was no competition because you have to bid if there's going to be competition. Let me back up. If these gentlemen cite a non-compete agreement and are presuming it's enforceable, that bars them from doing business with reliable customers, then I don't understand what you're saying. They could do business with reliable customers as long as Reliable didn't try to do business with them again? Well, if it's a question of competition, there has to be two parties competing for the same business. And the record is deficient with evidence of Reliable Fire actually competing with High-Rise or vice versa. I'm not sure. Okay, okay. I just didn't – I want to make sure I understand that. It's not coming to me. If they are not allowed to do business with reliable customers, and as that term is defined, you're saying they can't do business with those customers as long as Reliable forgoes the opportunity to bid? In our view, if there's competition, there has to be two parties or two companies, in essence, competing for that business if we're going to go under the non-competition provision of this employment agreement. If Reliable is already doing business with them, what further competition needs to be ongoing to involve the provisions of the agreement? Because – and I thank you for that question because it's given me an opportunity to explain the customer relationship. Companies such as Reliable Fire and High-Rise get invited to bid, and unless they're invited to bid, there won't be an opportunity to get a particular job or contract. So upon receiving the bid, they will prepare a proposal, submit it to an electrochemical contractor or an end user, and if they come in at the lowest price, because this industry is price-driven, then they could most likely receive that job. So they first have to be invited to bid. If they are successful because they've come in at the lowest price, they do the work, closeout documents are complete, that ends the customer relationship, Your Honors. That's what I was going to ask. So you're saying a business entity is only a customer for a very – for a particular job, and then there is no more relationship? They're not a customer anymore? That's correct, Your Honor. Until the next time they're invited? That's correct, Your Honor. And is this – whose definition of customer is this? Is this in the industry, so to speak, or is this your definition of customer, I guess? It's the industry's definition, and the record supports this from the November 2007 bench trial. Well, more to the point, is this definition in the agreement, and shouldn't it be in the agreement? Shouldn't this definition be in the agreement? Your Honor, that's a very good question, and in our opinion, this is why we believe the trial court raised the issue of understandability of this employment agreement and correctly pointed out that through all the testimony at the November bench trial, it was not made clear who these two parties actually agreed on were going to be the customers. And so the trial court was concerned about grafting onto that agreement something that the trial court wasn't clear that the parties had intended on. So the plaintiff called no customer to the witness stand to testify that both Reliable Fire and Hi-Rise asked for their business and that they went with Hi-Rise. So there was no evidence of competition, none whatsoever. All right, so customers are not defined in the agreement. Whose obligation under the law is it to define the customer base? That would be construed against the director of the agreement, would it not? Yes, Your Honor. In this case, that was Reliable Fire. And this is why the trial court stated, quote, I cannot believe that after four years of strenuous litigation, there's no customer that testified that they were solicited, end quote. And then the trial court went on and stated, quote, there is absolutely no concrete evidence of solicitation. There's no customer that says Rene Garcia or Arnold Arredondo contacted me on September 2nd or September 14th and asked to bid on something. So the conclusion we would have that there is, according to your opponent, they did, I mean, obviously they did some business with entities that had done business with Reliable in the preceding year. Right? The only business that Mr. Arredondo and Mr. Garcia did in the preceding year was business for Reliable Fire. Okay, now I'm talking about. Just to clarify that they did no business on behalf of Hi-Rise. Well, I'm talking about in the year when they started Hi-Rise. According to the contract here, they can't go back and do business with anybody that had done business with Reliable in the preceding year. Right? I mean, that's what they're prohibited from doing. Well, but then we get to the issue, Your Honor. I'm trying to get a question out here, and I haven't got to yet. You said there's no evidence that they solicited any of these customers. Is there any evidence that they did business with Reliable customers, as that term is defined in the agreement? Well, the exhibits that were introduced was an exhibit prepared that had a date of 9-22-04, which in the record was explained. That was the date the report was initially created and then just not updated. But the flaw in that exhibit is that there are no dates, no quote dates. Well, I think it's kind of a simple question. Maybe this case is so straightforward that they didn't do any business with any Reliable customers anyway. I don't hear you saying that. I hear you telling us that they didn't solicit Reliable customers, which tells me that, in fact, if you want to emphasize they didn't solicit the business, you must be conceding that they did the business. Somehow they did the business with these some Reliable customers. Did they or didn't they? Did they do any business with any customers of Reliable, as that term is defined in the contract? Only after they separated their employment. I understand that. Okay. But within the first year of leaving their employment, they did and got jobs that had used Reliable within the preceding year. Right. They did. But I just want to… I haven't finished. I just want to know if that's… I mean, I assume that was the case. Yeah. Okay. Now, but you've also told us that people don't or cannot bid unless they're asked to bid. Correct, Your Honor. So how is it that these customers came to ask Mr. Arredondo and Mr. Garcia and their new company to bid? They would have from prior experience. That's kind of his point. But we get to the issue of the unreasonable restraint on trade because now we're taking this out of the realm of between Reliable Fire and Hi-Rez and saying this third-party customer shouldn't be able to do a business with a company like Hi-Rez. But that's an unreasonable restraint on trade. That customer may want the lowest price, and that's how this industry operates. And now we're affecting a third party. We sure are. You're right. And we believe that that's an unreasonable restraint on trade in this employment agreement. Did the trial court strike it down on their basis? The trial court struck it down for a few reasons. One, that it was a lack of understandability in terms of who the parties agreed on were a customer. Struck it down on the basis that Reliable Fire does not have a protectable interest in either its confidential information, its pricing methods. So for a variety of reasons. But was restraint of trade argued at the trial court level as a grounds for invalidating the agreement? Well. Can you tell us that? I don't know specifically that the trial court used those words. But the trial court did, when explaining that there was a complete lack of evidence, used five pages in the trial court's ruling to explain the lack of evidence, which we viewed that as to basically say there should be no questions, if this case were ever brought to appeal, as to the reasoning used by the trial court. I'm only asking it for very obvious reasons. I want to know if you're raising an argument for the first time before this court that you did not raise at the trial court level this restraint of trade. You're throwing that out now. Did you argue that before the trial court? I don't remember using the exact words in any pleading or motion, Your Honor. But clearly that has this unintended effect. And so since there was no evidence of solicitation, since there was no evidence of competition, not surprisingly, Your Honors, there were no actual damages. Directing your attention to our second point, the plaintiff failed to prove actual damages. The plaintiff based its entire case on estimates, pure speculation, lack of foundation, and as the trial court correctly found, an inadmissible calculation of prospective damages. And so the trial court then, with good reason, threw out plaintiff's expert's report and schedules. And after discussing... I'll try to interrupt you again, but please hold that thought. I don't want to distract you for too long, but when you emphasize this here, it's still kind of in the back of my mind a little bit. If reliable neglected to bid on a job, you said there's no competition there, so there's no problem. There really can't be a problem. But if you say the standard here is that people, companies, don't ever bid unless they're asked to bid. Right. Okay, so you've got these two sales guys for reliable. They're asked to bid, apparently, in the name of that new company, and they're the two guys that the customer dealt with last year, or maybe not. And they wouldn't be restricted to that, but they could be the same. And so they know these guys are reliable salesmen, so they don't go to reliable for the bid. Instead, they just take the bid from the guys who used to work for reliable. So maybe the customer doesn't ask reliable for a bid, because the customer's dealing with former reliable salesmen. And one other aspect of this whole relationship is that there is no exclusivity between these customers, between an electrical contractor and these distributors. As we were discussing before, Well, do you dispute that they have a stamp history of a record that demonstrates a history of 85% retention? Does the record refute what he said up here? Not in our view. Not in our view. Well, I don't know what your view or his view of what the record says. I mean, they say that the record shows them having 85% retention of their customers. Well, what does the record say? That's totally, if that were their argument, that's totally defeated by all the witnesses who testified in the bench trial in November of 2007. Well, when you say that the retention of reliable customers was what percentage, according to the evidence that you cited? I don't want to speculate, but all the witnesses that testified in the November bench trial say it's price-driven. They will go with the lowest price. It could be price-driven and still be 100% retention. It's not 100% retention. I know that much because these witnesses are all consistent. They will go with whoever comes in at the lowest price, and they will share bids that they receive from distributors amongst other distributors. And going back, Your Honors, to my second point, the trial court, when concluding that there was no evidence of competition, correctly stated, but more important, there is an absolute dearth of proximate damages from any activities. So the plaintiff presented no evidence of competition, and as a result there were no actual damages, Your Honors. Directing your attention to our third point, the trial court's November 2007 ruling correctly found that the employment agreement was unenforceable as a matter of law, and that had the effect of ripping the guts out of the plaintiff's case because the plaintiff's second amended complaint was based on Section 5 of the employment agreement. And what did the plaintiff do? Your Honors, it's about what the plaintiff did not do, and there were three failures. The first failure, after the bench trial, the plaintiff did not seek leave to amend its second amended complaint to add an allegation for breach of Section 1 of the employment agreement, which they've done for the first time on appeal. The second failure, the plaintiff then let seven months go by until the May 2008 interim proceedings and let an eighth month go by until the June 2008 jury trial and still did not seek leave to amend its second amended complaint to add this allegation of breach of Section 1. And then the third failure, Your Honors, nor did the plaintiff ever file a motion or a pleading with a prayer for relief asking the trial court to blue pencil the employment agreement. So this new allegation of breach of Section 1 has been waived on appeal and this new argument of blue penciling has been waived on appeal. So these three failures, Your Honors, are also reasons why the plaintiff does not deserve a remand or a retrial. In closing, Your Honors? In closing? If you can make a choice, sure. Your Honors, this is not a case of first impression after Sunbelt. This is a case of absolutely no evidence. So we do not have to get to an analysis of the time and territory restrictions and we do not have to get to an analysis of the legitimate business interest test. If we apply these tests, we believe, Your Honors, that we have demonstrated in our briefs that the defendants would prevail. If, Your Honors, focus your attention on the real reasons why we are here, it will become evident that what was written in plaintiff's briefs was an attempt to misdirect the appeal to detract from their failures before the trial court. Thank you, Counsel. Thank you very much, Your Honors. It's an opportunity to stand before you today. Mr. Banasek? Thank you. Mr. Banasek, does the agreement define customers? Well, it defines customers as the people or entities that had done business with Reliable in the one-year period prior to Mr. Arredondo and Mr. Garcia's departure. And there was testimony about who those customers were. I think anyone knows who those customers were. If I go into a store and I ask you, well, who are the customers? They're the people who buy your products or services. It doesn't have to be defined to a particular type of business. I may have unearthed something here because if you don't define customers, he's alleging, and obviously you can respond to it, that within the industry you have a job, it's big, it's completed. If you're defining customers as someone that Reliable ever worked with, I mean, that's pretty broad. Customer would seem to imply there's some type of an ongoing, what I call, relationship with somebody. He's saying it's over and done. So nine months later, ten months later, these people are all in the phone book. They could be solicited by a number of people, but they can't talk to these people even though they didn't work with them directly. That seems a little overbroad. And the second part of my question is somebody on behalf of Reliable drafted this agreement, did they not? Why didn't they define more definitively what a customer is? Well, to the first point about the relationship issue, there is a relationship there, and it doesn't end when the job ends. That's why when Mr. Arredondo and Mr. Garcia leave, you're seeing people contact them and say, I've got a new project I'd like you to work on. So that relationship doesn't end just because a particular job ends. The same way that a patient forms a relationship with a doctor, you wouldn't say, well, that relationship ends because their patient visit is done and then it doesn't begin again until they have a further office visit. You're equating the sales relationship of Reliable to a doctor and a patient? Well, I don't think it's the same, but my point is that there's a relationship formed there, and that's why those customers come back to Reliable through the salespeople, because they've come to rely on them, they've done business with them, they've gotten good product, good service. And so it doesn't end just because a particular job ends. So it's product and service, not low cost. Well, there's no question that cost is a part of it. Well, we heard, isn't cost really the bottom line here? I mean, you're telling us that a customer would have used Reliable even though somebody else would have submitted a lower bid? Well, there is. If you had someone who came and got a quote from Reliable and it was the lowest quote and they accepted it and Reliable does a poor job, they don't get the equipment in on time, and all these are tied to schedules for construction of a building. So these things need to go in on time, they need to go in right, they need to be done properly. If someone gets a low quote for a project and gets bad service from Reliable, they're not going to come back. So price is certainly a part of it, it's certainly a significant part of it, but there are other aspects to building that relationship. And that's why Mr. Redondo and Mr. Garcia even testified that they go out on lunch calls with people, they try to provide good service. There are all sorts of things that go into building that ongoing relationship so that they do have a stream of business from those customers. So, yeah, it's not driven completely by price and it doesn't end just because the project ends. And those are the relationships that are trying to be protected. So getting back to the second part of the question, shouldn't customers have been defined in the agreement? Was it not prepared by the plaintiffs? It was prepared by the plaintiffs. To be honest, Your Honor, I've never seen an agreement that defines the term customer. I think everyone who works in a business understands and knows who those customers are. I don't think that term requires a definition. Well, it has to be in the context of the industry. I mean, I agree, generally speaking. But he's saying this is a one-time, it could be a one-time deal, equipment is installed, it's done. Is that somebody, indefinitely, forevermore, a customer? Doesn't it have to take its meaning from the context of the industry? Well, it does take its meaning from the context of the industry. But it is defined in the agreement as someone who's done business with Reliable in that preceding year. So under your definition, if there's someone who has done a project with Reliable in the preceding year, then they would be covered by the customer definition. But that could be an electrical contractor, but aren't there also end users involved here? Correct. So which one is the customer, the end user or the electrical contractor? Well, it's both. It's the people that Reliable sells its products and services to. In some cases, they're sold to electrical contractors. In other instances, they're sold directly to a building owner. So it depends on what the relationship is. But again, we're talking about having it defined by the nature of the business. Everyone understands that. You don't have to define that. They know who they're selling to. They know who their customers are. And in some cases, it may be an end user. In some cases, it's the contractor. Would the service end of business probably logically be with the building owner? Yes. Yeah, I think typically in a lot of the service contracts and service work is with the building owner. There may be instances where non-service work is contracted. Let me get this back to the issue of damages. His position and your point's position was that if there was a job with a high-rise bid that went to a customer, I lost a single word here, that had done business within that appointed time of year, but that Reliable itself didn't bid on the job, they're saying that you've got nothing there. What's your reaction to that? Well, my reaction is that's the whole point of having this agreement because what they're doing is when they leave and that customer contacts them, it is irrelevant who makes the initial contact. Assuming the customer contacts them, they're taking away from Reliable the opportunity to quote that project because Mr. Hernando and Mr. Garcia are the contact people for that customer. So when you get to damages, do you have to then establish a trial that not only that they steered that business away from Reliable to this new company, High-Rise, got the job, do you have to establish that new damages phase that you would have gotten the job? Well, no, because the opportunity was never available to Reliable to get that work. So how do you measure the damages? Do you assume you would have gotten the job that the two salesmen who got it for High-Rise would have gotten it for Reliable? Correct, and I think that's pretty good evidence that Reliable would have gotten it. If they were able to get it for High-Rise, I'm not sure why they would not have been able to get it for Reliable. I think that's true in any kind of sales business in terms of proof of damages. On an agreement like this, what you're proving is the business that you lost to them, and the whole basis for the agreement is that you didn't have the opportunity to get that business. So thank you very much. Do you have any questions? Thank you very much, counsel. We appreciate the arguments that have been made today. The court will take the matter under advice.